MONADNOCK RAILROAD *v.* FELT.

The construction of a written contract is for the court ;—therefore, when the instrument contains no words requiring interpretation, it is error to leave it to the jury to say what the parties intended as to the scope and effect of their contract at the time of its execution.

The defendant subscribed for shares in the M. Railroad,—a corporation then existing in this State,—upon a book which contained the condition that the subscribers should not become liable for the payment of their subscriptions until 2,000 shares of said stock should be taken in cash or its equivalent. Afterwards the M. Railroad was chartered in Massachu-

setts, with power to unite with the M. Railroad in this State; and the town of W. in Massachusetts was empowered to subscribe for a certain amount of stock in the Massachusetts corporation, which they did. Afterwards a union was formed between the two corporations, thus forming one line from P. in New Hampshire to W. in Massachusetts; and they have since been operated as one. Without counting in the subscriptions of the town of W., 2,000 shares of stock in the M. Railroad were not taken.

*Held,* that, inasmuch as the Massachusetts corporation was not in existence at the time of the subscription, there was no latent ambiguity in the contract as to what was meant by the M. Railroad, and parol evidence was therefore not admissible to show that the parties understood and intended by it the united enterprise of a railroad from P. to W. : hence, that the condition upon which the subscription was made had not been performed, and the defendant was not liable to pay for the shares.

ASSUMPSIT, by the Monadnock Railroad against Granville P. Felt, for calls on twenty shares of the capital stock of that company alleged to have been taken by the defendant.    On trial upon the general issue, the plaintiffs claimed a balance due on the calls of $800 and interest, —the stock having been sold by the corporation for the sum of $1,200 for non-payment of the calls.    The claim of the plaintiffs was founded upon the subscription of the defendant for twenty shares of the stock, made July 3, 1868.    At that time the corporation was not organized, although it was previously chartered.    It was in fact organized in October, 1868, and went into operation.    The book subscribed by the defendant was prepared at a meeting of citizens of Peterborough and other towns friendly to this railroad enterprise, and holden July 3, 1868; and the terms of the subscription were as follows :    •

We, the undersigned, agree to take the number of shares of stock in the Monadnock Railroad set against our respective names, said shares to be rated at one hundred dollars each, upon the express condition that we shall not become liable for the payment of any part of the same until 2,000 shares of said stock shall be taken in cash or its equivalent, *bona fide*, in addition to the gratuities of five per cent. of their respective valuations voted by the towns on the line of the road.

The plaintiffs claimed, and offered evidence tending to prove, that about 2,150 shares had been subscribed in the stock of the Monadnock Railroad : but this included 300 shares subscribed by the town of Winchendon in Massachusetts: but it was objected that no authority to subscribe for stock in this railroad was shown, and therefore this stock could not be counted.    It appearing, however, that the stock had been paid by the town, in the assessments called for by vote of the directors, the court ruled this was a ratification of the authority of the committee who made the subscription ; and the defendant excepted.    At the time the defendant's subscription was made (July 3, 1868), the

Monadnock Railroad in New Hampshire had been chartered but not organized. In May, 1869, the Monadnock Railroad in Massachusetts was chartered by the legislature of that State, with the power to unite with the New Hampshire corporation, so that the stockholders of one should be the stockholders of both corporations ; and the town of Winchendon were empowered by special act of that legislature to subscribe a certain amount to the stock of the Massachusetts corporation, but had no authority to subscribe for the other. In the charter of the Monadnock Railroad in New Hampshire, passed December 13, 1848, it was provided that this railroad might " intersect and unite with any railroad corporation on the line of the State that the legislature of Massachusetts may charter, connecting with said Cheshire Railroad." The capital stock of the New Hampshire corporation was fixed in the charter at 3,000 shares, and of the Massachusetts corporation at $50,000. A union was effected between the two corporations July 7, 1869, and they have since been operated as one, and under one set of officers ; and a railroad has been built from Peterborough to Winchendon, intersecting with the Cheshire Railroad at that place, two miles and two hundred feet of the road being in Massachusetts, and fourteen miles less two hundred feet being in New Hampshire. The Winchendon subscription was upon a book or paper other than the one signed by the defendant, but was substantially on the same terms for stock,— 300 shares in the Monadnock Railroad,—without further designation, with some conditions as to the place of termination in Winchendon. It was dated October 19, 1868, and subscribed by Winchendon and two others,—in all, 1,000 shares ; but it appeared that the subscriptions were in fact not made until about June, 1869. The evidence tended very strongly to show that the Winchendon subscription was made under the power given by the Massachusetts act to subscribe for stock in the corporation there, and was for that corporation ; and without that subscription it was clear that the 2,000 shares mentioned in the book subscribed by the defendant had not been taken. It appeared that this stock was assessed with the rest by the directors of the united corporations, and the assessments paid to their treasurer,—the assessments commencing in September, 1869,—and nearly $50,000 expended on the Massachusetts part of the road. The defendant contended that no assessments could legally be made until the 3,000 shares fixed by the charter had been taken,—notwithstanding by the subscription the condition was 2,000 shares,—and also contended that if the 2,000 was to govern, yet, as the capital of the Massachusetts corporation was fixed at $50,000, there must be taken stock at least to the amount of $250,000 before assessments could be made. But the court overruled both or these objections, and the defendant excepted. It appeared that the corporation, on October 20, 1868, by vote at a meeting of the corporation, reduced the capital stock to $200,000.

The court instructed the jury, that, if the Winchendon subscription was for the Monadnock Railroad in Massachusetts, and not for the Monadnock Railroad mentioned in the defendant's subscription, it

could not be counted towards the 2,000 shares ; but, for the purpose of settling all the questions of fact that might arise in these cases, they might inquire whether, in using the terms " 2,000 shares in said stock " in the defendant's subscription, so many shares in the united enterprise of a railroad from Peterborough to Winchendon were contemplated by the parties, and if they found it so, they might count the Winchendon subscription if they found it made for the united enterprise ; and to these instructions the defendant excepted.

The jury returned a verdict for the plaintiffs, and the defendant moves to set it aside.

*Smith, Scott,* and *B. Wadleigh,* for the defendant, cited ·*Contoocook Valley Railroad* v. *Barker,* 32 N. H. 363 ; *N. H. Central Railroad* v. *Johnson,* 30 N. H. 390 ; *Littleton Manufacturing Co.* v. *Parker,* 14 N. H. 543.

*Parks* and *Wheeler & Faulkner,* for the plaintiffs.

The object to be attained by the construction of the Monadnock Railroad was, to furnish railroad facilities to the inhabitants of Peterborough, Jaffrey, and the neighboring towns, by a line of road from Peterborough to Winchendon, to connect with the Cheshire Railroad. To accomplish this object it was necessary to obtain a charter in this State, and also one in Massachusetts, and to take some further steps towards an organization, before they could be legally united so as to make a single corporation. It could never have been in the contemplation of any one that two separate corporations were to be continued and supported to construct and operate a dozen miles of railroad, costing perhaps a quarter of a million dollars. The charters both show what was expected and intended, and provision was made in them for uniting the corporations. In pursuance of this intention, the terms of subscription to the stock of the two roads were identical, so far as it was practicable. And the Winchendon subscription was, in its language, as much applicable to the whole line as to that part in Massachusetts. It was a subscription to the stock of the Monadnock Railroad, at a time when that road extended in fact from Peterborough to Winchendon. And the fact that the payments were all made to the plaintiff corporation and expended on the ·whole line of the road, without objection from any one, is a strong indication that it was so understood by all parties at. the time. The two corporations were united July 7, 1869 ; but no assessments were made until the following September. At that time the subscriptions for the united corporation exceeded the 2000 shares required. The assessments were made upon all these shares, and, so far as any of those in question were concerned, were duly paid. It is said ·that the Winchendon subscription was not *bona fide ;* that it was illegal and incapable of ratification ;—but we submit that a subscription which is actually made, and seasonably paid by the party subscribing, has in it some of the elements which go to make it *bona fide.* If the Winchendon subscription was made in such a way

and under such a state of facts that it might have been invalidated by the parties immediately interested, and they did not take advantage of this, but chose to ratify the act by paying the assessments, it is too late for third parties to make objection.

The validity of the subscription is to be tested, not by the state of things at the time of the subscription merely, but at the time of the first assessment. The subscription was a continuing offer, which was accepted by the plaintiffs before it was revoked, and so constituted a binding contract. *Boston & Maine Railroad* v. *Bartlett*, 3 Cush. 224. At the time the first assessment was made, was there a valid subscription for not less than 2000 shares ? The jury, on all the evidence in the case, have found that there was ; and that verdict must stand, unless there was error in the ruling of the court in regard to the united enterprise. The terms of the Winchendon subscription show that it could not have been intended as a subscription to the Massachusetts corporation alone, as it required 2000 shares to make it valid, when that charter limited their capital stock to $50,000. What was intended by the words "Monadnock Railroad" might well be left to a jury, under the instructions of the court, as a latent ambiguity, since there had been in existence two corporations of that name engaged in parts of the same enterprise, and these had been subsequently united under the same name. If it could be held that the united corporation had a capital of $250,000, it would in no way change the liability of this defendant, as by the terms of his subscription he had fixed 2000 shares as the limit at which the subscription should be binding. He thereby waived an objection which might otherwise have been made under the authority of *Railroad* v. *Barker*, 32 N. H. 363. It is well settled that one who subscribes for shares before an act of incorporation is obtained, or before the organization of the corporation, is liable to pay his subscription, and may be sued in the name of the corporation after it has been organized. 1 Redfield on Railways, sec. 57, p. 215.

Whenever a railroad is constructed lying in two or more States, there is always the same embarrassment to be encountered in the early stages of the proceedings. There must necessarily be separate charters at the start, which are intended to be united into one corporation at as early a stage as practicable. All parties have in view the united enterprise, and act in reference to that. It would be an intolerable hardship, if the whole enterprise were to be defeated and the public good sacrificed on account of some technical quibble about the separate original subscriptions. And it is a sufficient answer to the defendant's objections, that, at the time of the assessments, the books of the plaintiff corporation showed a subscription of over 2000 shares of stock, and that the subscriptions now called in question were promptly paid without objection, and the proceeds expended upon the road.

LADD, J. The contract of subscription, upon which the plaintiffs seek to recover, is in writing, and its construction and interpretation are for the court.

It is not claimed that the instrument contains any unusual, technical, or official words, the meaning of which, as used, must be submitted to the jury; but it is said that it presents a latent ambiguity,. which renders parol evidence admissible to show what the parties intended by the words "Monadnock Railroad."

If any ambiguity exists, it is obvious that it is a latent ambiguity in ' the strict sense of that term, for no uncertainty or doubt appears upon the face of the instrument itself. The subscription was for twenty shares of stock in the Monadnock Railroad; and the condition upon which the defendant was to be liable to pay for it is express and plain,— that two thousand shares of "said stock" shall be taken in cash or its equivalent, before his liability to pay should attach.

The familiar examples of latent ambiguity given by Lord BACON, Reg. 23, and in *Altham's Case,* 8 Co. 155, *a,* show a double application of words of description to persons and things,—the subjects and objects of the contract or devise. In such cases, and such only, extrinsic evidence of intention is admissible to remove the uncertainty. It may be shown which of two or more persons or things was intended by a description equally applicable to all. 1 Par. on Cas. 560; 1 Greenl. Ev., sec. 300; 2 Kent's Com. 555; *Brown* v. *Brown,* 43 N. H. 17.

If, at the time this contract was entered into, there had been two or more Monadnock Railroads, it is plain enough the plaintiffs might show, by parol, which was intended. But the difficulty with this part of the plaintiffs' case is, that there was but one. The case shows that the only Monadnock Railroad in existence at the time of the subscription, July 3, 1868, was that chartered by the legislature of New Hampshire in 1848. The Massachusetts corporation of that name was not chartered till ten months later, that is, in May, 1869; and the present Monadnock Railroad, which seems to be constituted by a union of the New Hampshire and Massachusetts corporations, did not come into existence until more than a year after, namely, July 7, 1869. How. can it be argued, then, that there is uncertainty or doubt as to which Monadnock Railroad was meant, when there was but one of that name at the time of the contract.

This is conclusive against showing the intention of the parties, in that respect, by parol. It comes clearly within the principle of Lord BACON'S reason for holding that a patent ambiguity is not holpen by averment, namely, "that it were to make all deeds hollow and subject to averments, and so, in effect, that to pass without deed, which the law appointeth shall not pass but by deed." It would, to all practical intents, annul the writing which the parties established as the evidence of their intention at the time, and allow to be substituted for it whatever a jury may think was intended long afterwards, when perhaps the interests of the parties, as well as their relations to the subject matter of the contract, may have wholly changed, and when evidence on which one or the other might rely to show the actual fact in that respect has gone beyond his reach by the lapse of time. This the law

does not permit. It was to prevent just this mischief that the wholesome rule, that a patent ambiguity cannot be explained by parol evidence, beyond proof of the surrounding circumstances, was adopted. *Webster* v. *Atkinson*, 4 N. H. 21 ; *Aldrich* v. *Jessimin*, 8 N. H. 516 ;— and see a very accurate and useful decision of the whole matter, in *Miller* v. *Travers*, and others, 8 Bing. 244.

The maxim " *Falsa demonstratio non nocet*," &c., presents no exception ; for, after rejecting so much of the description as is false, in order that the instrument may take effect, there must still be enough left to show the intent, and ascertain its application. *Peaslee* v. *Gee*, 19 N. H. 273 ; *Andrews* v. *Todd*, 50 N. H. 565 ; *Doe* v. *Hubbard*, 15 Q. B. 240.

An intention not clearly shown by what remains cannot be imported into the instrument by extrinsic evidence.

In giving construction to a written contract, courts always receive such evidence of the surrounding circumstances as will place them as near as may be in the position of the parties at the time it was made.

In *Lady Herdley's Case—Shore* v. *Wilson*, 9 Cl. & Fin. 556—the great question was as to what was the sense in which the words " godly preachers of Christ's holy gospel " were to be understood in the deed creating the trust. To show this, extrinsic evidence was received ; and Baron PARKE, in delivering his judgment, said,—" For the purpose of applying the instrument to the facts, and determining what passes by it, and who take an interest under it, every material fact that will enable the court to identify the person or thing mentioned in the instrument, and to place the court,—whose province it is to declare the meaning of the words of the instrument as near as may be in the situation of the parties,—is admissible in evidence."

In *Attorney-General* v. *Clapham*, 4 DeG. McN. & G., at page 628, Lord Chancellor CRANWORTH, speaking of the admission of evidence for such a purpose, says,—" It is like the evidence afforded by a dictionary, which enables us to translate a foreign language,—or a book of science, which gives us the meaning of words of art."

The illustration of. Sir JAMES WIGRAM is also extremely clear. He says,—" A page of history may not be intelligible till some collateral extrinsic circumstances are known to the reader. No one, however, would imagine that he was acquiring a knowledge of the writer's meaning from any other source than the page he was reading, because, in order to make that page intelligible, he required to be informed to what country the writer belonged, or to be furnished with a map of the country about which he was reading. Wigram on Wills, sec. 76.

Nothing remains but to make a correct application of these well settled and familiar principles to the case before us.

Enough has already been said as to any latent ambiguity within the meaning of Lord BACON's rule. The evidence shows none, because there was but one Monadnock Railroad in existence at the time of the subscription.

But looking at the contract by the light of the circumstances under which it was made,—that is, assuming as far as possible the position of the parties to it at that time, can it be said that it speaks a doubtful language? Does the paper thus viewed show for itself that the words "Monadnock Railroad" mean some other legal person than the only Monadnock Railroad then in existence, or leave it doubtful what was intended? We think not. If the contract had been read before the Massachusetts corporation was chartered, and before the two corporations were united, it is plain nothing could have been found in it to suggest a doubt as to what was meant by Monadnock Railroad. To show then, by parol, that the parties understood and intended something else, would be to annul the written contract and substitute for it a verbal one,—or one perhaps only to be inferred by the jury from the acts and conduct of the parties.

The objection of the defendant's counsel that the subscription of the town of Winchendon in Massachusetts must be regarded as a subscription for stock in the Massachusetts corporation, according to the act conferring the authority to subscribe, and as the evidence tended strongly to show the fact was, and that therefore it could not be counted in making up the 2,000 shares, would appear to be quite formidable, and very likely on examination might prove to be decisive of the case. But the views expressed above make it unnecessary, we think, to consider this question, or others that might be raised upon the case, some of which, not alluded to in the arguments, might be of no small importance and difficulty.

For the purpose of settling all the questions of fact that might arise in this case, and a large number more supposed to involve nearly the same questions of law now pending in this county, the court instructed the jury that they might inquire whether, in using the terms "2,000 shares of said stock" in the defendant's subscription, so many shares in the united enterprise of a railroad from Peterborough to Winchendon were contemplated by the parties, and if they so found, they might count the Winchendon subscription if they found it made for the united enterprise. These *pro forma* instructions either assume that there was a latent ambiguity in the written contract of subscription as to what was meant by the Monadnock Railroad, which, we think, did not exist, or they are founded on a view of the law which we think erroneous. In either view they cannot be sustained.

Upon a careful examination of the case, we are of opinion that there was nothing that should have been submitted to the jury.

The contract must be interpreted by the light of the circumstances which existed at the time it was made, and not of those which arose afterwards.

Looking at it from that point, we see nothing which requires explanation. The 2,000 shares spoken of in the condition are described as "shares of said stock,"—that is, shares of the stock of the Monadnock Railroad.

The plaintiffs failed to show that 2,000 shares of stock in the only

Monadnock Railroad to which the contract can be legally applied had been taken at the time of the calls; and unless they do so, it is clear the condition is not fulfilled; and the defendant's liability to pay has not attached.                                    *Verdict set aside.*